IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
UNITED STATES OF AMERICA,              No   CR 05-0549 VRW
            Plaintiff,                      ORDER
      v
STANMORE CAWTHON COOPER,
            Defendant.
                                    /
```

    Defendant Stanmore Cawthon Cooper is charged with three counts of making false statements to a government agency in violation of 18 USC § 1001.  Cooper moves to suppress evidence. For reasons discussed below, Cooper's motion is DENIED.

I
A

    The Federal Aviation Administration (FAA) licenses civilian pilots in the United States.  Private pilots licensed by the FAA must pass a medical examination every two years in order to

obtain or renew their medical certificate from the FAA, which is a precondition to continued licensure.  FAA Form 8500-8 must be completed as part of the application for a medical certificate.  The examinee completes the first part of the form; the examining physician completes the remainder of the form.  Question 18 asks examinees to indicate whether they have been diagnosed with various medical conditions; Question 18(x), a catch-all, inquires about "[o]ther illness, disability, or surgery."  Doc #16 (Jackson Decl), Ex B.

Cooper's counsel represents, and the government does not dispute, the following facts:  Cooper obtained a private pilot license in 1964.  In 1985, Cooper was diagnosed with the HIV virus.  Because the FAA was not at that time issuing medical certificates to persons with HIV, Cooper did not renew his medical certificate.  By 1995, Cooper's health had deteriorated and he applied for and obtained disability benefits from the Social Security Administration (SSA).  New drug treatments allowed Cooper to terminate his disability benefits and return to work in 1996.  In 1998, Cooper learned that the FAA had begun issuing medical certificates to eligible HIV-infected persons.  Unable to find any guidance regarding eligibility, and for fear of being disqualified, Cooper applied for a medical certificate in 1998 without disclosing his HIV condition.  In 2000, Cooper discovered the criteria governing special issuance of medical certificates to persons with HIV.  Cooper verified for himself that he met the criteria but nevertheless did not disclose his condition in 2000, 2002 and 2004, fearing possible punitive repercussions for his failure to disclose his condition in 1998.

**B**

The Office of the Inspector General of the Department of Transportation (DOT-OIG) and the Office of the Inspector General of the Social Security Administration (SSA-OIG) each have the responsibility of investigating crimes related to information gathered by their respective agencies. Jackson Decl ¶1; Doc #18 (Stickley Decl) ¶1. In the aftermath of the terrorist attacks of September 11, 2001, SSA-OIG and DOT-OIG undertook a project known as "Operation Safe Pilot," whereby SSA-OIG reviewed information submitted by licensed pilots to the FAA. Doc #17 (Lasher Decl) ¶4. The purpose of Operation Safe Pilot "was to identify any active FAA-licensed pilot who had obtained a license through misrepresentation, generally of an SSN, on an FAA application." Id ¶6. According to SSA Special Agent Robb Stickley, Operation Safe Pilot proceeded as follows:

> DOT-OIG provided SSA-OIG with each pilot's name and SSN, as provided to the FAA by the pilot. SSA-OIG then compared that information to SSA databases. During the course of that comparison, SSA-OIG discovered that certain pilots were receiving or had received disability payments while simultaneously claiming to the FAA that they were medically fit to pilot an aircraft.

Stickley Decl ¶2.

Although "these discoveries were ancillary to" the original purpose of Operation Safe Pilot, Lasher Decl ¶7, they nonetheless prompted fraud investigations, whereby the SSA-OIG disclosed information to the DOT-OIG. Cooper was the subject of one such investigation.

Based on non-disclosure of his HIV condition on the applications for a medical certificate in 2000, 2002 and 2004, the indictment charges Cooper with three counts of making false

3

1 statements to a government agency in violation of 18 USC § 1001.
2 Doc #5.  Cooper moves to suppress the records shared by the FAA and
3 the SSA and all other evidence obtained as a result of the exchange
4 of those records.

## II

Cooper initially advanced three legal grounds for suppression:  the agencies' sharing of his medical information violated (1) the Fourth Amendment; (2) the Privacy Act of 1974, 5 USC § 552a; and (3) the Computer Matching and Privacy Protection Act of 1988 (CMPPA).  Cooper has since conceded that the CMPPA does not apply to the facts of this case.  Doc #20 at 14.  Accordingly, the court confines its discussion to the first two claims, but in reverse order.

### A

The Privacy Act provides:  "No agency shall disclose any record which is contained in a system of records by any means of communication to any other person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 USC § 552a(b).  Significantly, however, this general prohibition is subject to twelve exceptions, including disclosures made pursuant to a "routine use."  Id § 552a(b)(3).  The Act defines "routine use" as "the use of such record for a purpose which is compatible with the purpose for which it was collected."  Id § 552a(a)(7).  Agencies are required to publish routine uses in the Federal Register.  Id § 552a(e)(4)(D).

The government contends that Cooper's records were exchanged pursuant to routine uses established by the FAA and the SSA. For example, the government cites the following routine use notice published by the SSA:

> Information from this system of records may be disclosed to any other federal agency or any foreign, state, or local government agency responsible for enforcing, investigating, or prosecuting violations of administrative, civil, or criminal law or regulation where that information is relevant to an enforcement proceeding, investigation, or prosecution within the agency's jurisdiction.

55 Fed Reg 46,248 (November 2, 1990), adopted by SSA-OIG, 60 Fed Reg 19,619 (April 19, 1995).

It is doubtful whether disclosure of Cooper's SSA records to the FAA <u>for the purpose of determining whether Cooper was entitled to a medical certificate from the FAA</u> is "compatible with" the purpose for which Cooper's information was collected by the SSA. See <u>Swenson v United States Postal Service</u>, 890 F2d 1075, 1078 (9th Cir 1989) (stating that compatibility under § 552a(a)(7) requires "more than mere relevance: 'There must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure.'" (quoting <u>Britt v Naval Investigative Service</u>, 886 F2d 544, 549-50 (3d Cir 1989))); see also <u>Covert v Harrington</u>, 876 F2d 751, 755 (9th Cir 1989) (suggesting in dictum that the collection of data for security clearance purposes would not be compatible with disclosure to a criminal investigation). Further, the court questions whether Form SSA-3368-BK (reproduced below, see *infra* II(B)) adequately informs individuals of the routine uses upon which the government now

5

relies as required by § 552a(e)(3)(C).  See <u>Covert</u>, 876 F2d at 755.  These uncertainties aside, the court concludes that a violation of the Privacy Act does not, by itself, justify exclusion of evidence in a criminal proceeding.

The Privacy Act specifies civil remedies and criminal penalties for violations of the Act.  See 5 USC § 552a(g), (i).  The Privacy Act does not explicitly provide that its remedies are exclusive.  Cf <u>United States v Forest</u>, 355 F3d 942, 949 (6th Cir 2004) (holding that suppression of electronic communications is not a statutory remedy under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which provides that its remedies are exclusive), vacated on other grounds, 125 S Ct 1050 (2005); <u>United States v Frazin</u>, 780 F2d 1461, 1466 (9th Cir 1986) (holding that an exclusionary remedy is unavailable for violations of the Right to Financial Privacy Act of 1978 because the statute specifies that its remedies were exclusive).  Nonetheless, courts outside this circuit have suggested that the Privacy Act's remedies are exclusive.  See <u>United States v Bressler</u>, 772 F2d 287, 293 (7th Cir 1985); <u>United States v Gillotti</u>, 822 F Supp 984, 989 (WDNY 1993).  Although these decisions are persuasive authorities, the court declines the government's invitation simply to follow those courts' lead without more.  Only <u>Gilotti</u>, in an opinion authored by a magistrate judge, considered the issue in the context of a motion to suppress.  Further, the court does not find the government's citation to Congress's expression of its intent to subject federal agencies to civil suit for Privacy Act violations, see Privacy Act of 1974, Pub L No 93-579, § 2(a)(6), to be particularly helpful; that statement of legislative purpose is no more probative of an

intent to create certain remedies <u>to the exclusion of others</u> than the remedial provisions themselves.  Still, the Ninth Circuit has declined to imply an exclusionary remedy for statutory violations when Congress has expressly created other remedies, regardless whether Congress provided that those remedies are exclusive.  See <u>United States v Michaelian</u>, 803 F2d 1042, 1049 (9th Cir 1986) (affirming district court's refusal to fashion an exclusionary remedy for violations of 26 USC § 6103(h), which restricts disclosure of tax information by the Internal Revenue Service to the Department of Justice).

Further, although the Supreme Court has in the past held it proper for federal courts to exercise their supervisory power to suppress evidence obtained through non-constitutional illegality, see <u>Miller v United States</u>, 357 US 301 (1958); <u>McNabb v United States</u>, 318 US 332 (1943), the Supreme Court has in more recent times refused to extend the exclusionary remedy to situations in which the defendant's constitutional rights have not been violated, see <u>United States v Payner</u>, 447 US 727 (1980) (holding it an improper exercise of supervisory power to suppress evidence illegally obtained from a third party); <u>United States v Caceres</u>, 440 US 741 (1979) (holding it an improper exercise of supervisory power to suppress evidence obtained in violation of agency regulations).  Although the Ninth Circuit has declined to "limit the exclusionary rule to use as a remedy for constitutional violations alone," it has nonetheless acknowledged that "an exclusionary rule is typically available only for constitutional violations, not for statutory or treaty violations."  <u>United States v Lombera-Camorlinga</u>, 206 F3d 882, 886 (9th Cir 2000) (en banc).

In sum, judicially implied exclusionary remedies for statutory violations are disfavored, particularly when Congress has specified other remedies.  Cooper overlooks these principles and does nothing more than argue that suppression is an appropriate remedy because the Privacy Act does not explicitly provide that its remedies are exclusive.  The court is unpersuaded and declines to exercise its supervisory power to fashion an exclusionary remedy in this case.  Accordingly, Cooper must show that his <u>constitutional</u> rights have been violated to obtain exclusion.

B

"The Fourth Amendment protects legitimate expectations of privacy rather than simply places."  <u>Illinois v Andreas</u>, 463 US 765, 771 (1983).  Accordingly, "[t]o invoke the protections of the Fourth Amendment, a person must show he had a legitimate expectation of privacy."  <u>United States v Nerber</u>, 222 F3d 597, 599 (9th Cir 2000) (quotations omitted).  In order to establish a legitimate expectation of privacy, a person must demonstrate that (1) he actually harbored an expectation of privacy and (2) the expectation was "one that society is prepared to recognize as reasonable."  Id (quotations omitted).

A few background principles of Fourth Amendment law guide the court.  First, "the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  <u>Katz v United States</u>, 389 US 347, 351-52 (1967) (citations

8

omitted).  Thus, it is not fatal to Cooper's position that his records were longer within his control, see, e g, <u>Ex parte Jackson</u>, 96 US 727, 733 ("The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be."), or that his records were lawfully possessed by the government, see, e g, <u>Walter v United States</u>, 447 US 649, 654 (1980) ("The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents" because "it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents.") (citations omitted).

But the protection of the Fourth Amendment is not without limits.  Relevant for present purposes, the Supreme Court has refused to recognize a legitimate expectation of privacy in information that an individual has shared with third parties, even when such disclosure was made under a cloak of confidentiality.  To the contrary, "[t]he [Supreme] Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used for a limited purpose and the confidence placed in the third party will not be betrayed." <u>United States v Miller</u>, 425 US 435, 443 (1976).  Similarly, when a defendant transmits information with the knowledge that it may be recorded and used by a third party for certain purposes unrelated to law enforcement, there can be no legitimate expectation of privacy notwithstanding that the defendant did not actually anticipate that

9

the information might be shared with law enforcement.  Thus, for example, the Supreme Court held that the use of a "pen register" to document telephone numbers dialed by the defendant did not constitute a search because it was "too much to believe" that telephone subscribers "harbor any general expectation that the numbers they dial will remain secret" given subscribers' knowledge "that they must convey numerical information to the phone company; that the phone company has facilities for recording the information; and that the phone company does in fact record this information for legitimate business purposes."  Smith v Maryland, 442 US 735, 743 (1979).  Although this case involves disclosure by governmental agencies rather than private third parties, the foregoing principles are still relevant inasmuch as Cooper claims an expectation of privacy in information he knowingly divulged to the outside world.

Relying primarily upon the Privacy Act, Cooper contends he had a legitimate expectation that the medical records he submitted to the FAA and the SSA would be kept confidential.  Although there is surprisingly little case law addressing whether the Privacy Act may give rise to a legitimate expectation of privacy in information provided to government agencies, courts have not been unreceptive to claims of a legitimate expectation of privacy predicated on the Privacy Act.  See, e g, United States v Jackson, 381 F3d 984, 990 (10th Cir 2004) (assuming, without deciding, "that the Privacy Act can create a reasonable expectation of privacy that could support suppression of evidence"); cf Kimberlin v United States Dep't of Justice, 788 F2d 434, 438-39 (7th Cir 1985) (opining, in the context of due process claims, that

**10**

1  the plaintiff's argument that he had an expectation of privacy
2  based on the Privacy Act "may be persuasive in a general context,"
3  but nevertheless finding no violation of plaintiff's rights because
4  disclosure was proper pursuant to the routine use exception).  The
5  court finds that the Privacy Act, although not necessarily
6  dispositive, could properly bear on a defendant's subjective
7  expectation of privacy or on society's preparedness to accept an
8  expectation of privacy as reasonable.  Cf <u>United States Dep't of
9  Justice v Reporters Committee for Freedom of the Press</u>, 489 US 749,
10 766-67 (1989) (looking to "Congress' basic policy concern"
11 expressed in the Privacy Act in evaluating an individual's privacy
12 interest in his FBI "rap sheet" for purposes of the Freedom of
13 Information Act).  But cf id at 762 n 13 ("The question of the
14 statutory meaning of privacy under the FOIA is, of course, not the
15 same as the question whether * * * an individual's interest in
16 privacy is protected by the Constitution.").

17         With regard to Cooper's subjective expectation of privacy
18 in the information submitted to the FAA and the SSA, the Privacy
19 Act statements printed on the forms completed by Cooper are the
20 proper starting point.  Form SSA-3368-BK, which Cooper completed as
21 part of his application for disability benefits, states that
22 information furnished "on this form is almost never used for any
23 purpose other than making a determination on your disability
24 claim."  But the form goes on to provide that

> such information may be disclosed by the [SSA] as
> follows:  (1) To enable a third party or agency to
> assist [the SSA] in establishing rights to Social
> Security benefits and/or coverage; (2) to comply
> with Federal laws requiring the release of
> information from Social Security records (e.g., to
> the General Accounting Office and the Veterans

11

>Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs). These and other reasons why information about you may be used or given out are explained in the <u>Federal Register</u>. If you would like more information about this, any Social Security office can assist you.

Stickley Decl, Ex A.

Similarly, although FAA Form 8500-8, which Cooper completed in connection with his application for a medical certificate, states that "the purpose of the information is to determine whether you meet [FAA] medical requirements," it further provides:

>These records and information in these records may be used (a) to provide basic airman certification and qualification information to the public upon request; (b) to disclose information to the National Transportation Safety Board (NTSB) in connection with its investigation responsibilities; (c) to provide information about airmen to Federal, state, and local law enforcement agencies when engaged in the investigation and apprehension of drug law violators; (d) to provide information about enforcement actions arising out of violations of the Federal Aviation Regulations to government agencies, the aviation industry, and the public upon request; (e) to disclose information to another Federal agency, or to a court or an administrative tribunal, when the Government or one of its agencies is a party to a [judicial or administrative proceeding]; and (f) to comply with the Prefatory Statement of General Routine Uses for the Department of Transportation.

Jackson Decl, Ex B.

Cooper argues that the disclosures were not made pursuant to any of the specific routine uses described on the forms. For Fourth Amendment purposes, Cooper's argument misses the mark. The question to be decided is whether Cooper had a subjective expectation of privacy, not whether the SSA and the FAA acted in conformance with the Privacy Act. And based on these two Privacy Act statements, Cooper could not have expected that his medical

information would be held in a level of confidence that would implicate the protection of the Fourth Amendment.  Although these statements did not advise Cooper that his medical information might be disclosed for purposes of inter-agency investigations such as Operation Safe Pilot, he was nonetheless apprised that his information might be disclosed to other agencies, third parties or the public for investigative and other purposes.

      According to Cooper, other considerations shaped his subjective expectation.  First, prior to applying for disability benefits, he was provided with a pamphlet (SSA Publication No 05-10020) that stated "[a]ll Social Security files are kept strictly confidential."  Doc #20 (Cooper Decl) ¶2.  Second, Cooper refers to a public policy known as "HIV Exceptionalism" described on the website of the Department of Health and Human Services, Health Resources and Services Administration.  Id ¶4.  According to Cooper, "one of the purposes of this policy was to provide extra statutory privacy protections to persons infected with HIV."  Id.  Finally, Cooper appears to suggest that his subjective expectation in the privacy of his medical information was shaped by the Privacy Act itself.  See Doc #11 at 8-9 ("Based upon the Privacy Act of 1974, [Cooper] had a reasonable expectation of privacy in that the highly sensitive medical records which he gave to the SSA should have been kept inviolate by their very nature.").

      With regard to "HIV exceptionalism," there is no evidence that this rather vague "policy" was incorporated by statute or regulations of the SSA or the FAA.  More importantly, Cooper does not -- and likely cannot -- state that this <u>actually</u> shaped his expectation of privacy when he submitted his medical information to

13

the SSA or the FAA.  Further, it is "too much to believe," <u>Smith</u>, 442 US at 743, that, based on the Privacy Act, Cooper expected his medical information would be "kept inviolate," Doc #11 at 9, by the SSA or the FAA given that the Privacy Act's protection is riddled with exceptions -- a reality that must have been apparent to Cooper based on the above-quoted Privacy Act statements.  Similarly, although the SSA's statement that all files would be kept "strictly confidential" could have, standing alone, given rise to a subjective expectation of privacy for Fourth Amendment purposes, any such expectation would have been undermined by the Privacy Act statements on Form SSA-3368-BK.

Even if the court were to accept that Cooper harbored an expectation of privacy, the court finds that Cooper's expectation is not one that society is prepared to accept as reasonable. "Legitimation of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." <u>Rakas v Illinois</u>, 439 US 128, 143 n 12 (1978).  Here, the court need look no further than the Privacy Act, which is a meaningful barometer of society's preparedness to accept Cooper's expectation as reasonable.  Cf <u>Reporters Committee</u>, 489 US at 766-67.  In this regard, the Privacy Act demonstrates that society is not prepared to accept as reasonable an individual's expectation that information he provides to one governmental agency will not be shared with other agencies for purposes of investigating violations of law.  Specifically, § 552a(b)(7) provides that agencies may disclose records

> to another agency * * * for a civil or criminal law

**14**

> enforcement activity if the activity is authorized by law, and if the head of the agency has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought.

Again, although it does not appear that the FAA or the SSA acted pursuant to this exception when they exchanged Cooper's records, see Lasher Decl ¶8, that is of no import.  What matters is that this exception reflects a societal determination that records containing information knowingly and voluntarily submitted to one agency are not protected from disclosure to another agency without a warrant or consent when such disclosure is made for purposes of law enforcement.  The court has no trouble concurring, especially when, as in this case, the agencies have reason to believe a violation of law has been committed.  Cooper does not cite, nor has the court found, authority indicating the Constitution requires more under these circumstances.  Accordingly, whatever expectation of privacy Cooper may have actually entertained, the court concludes that society is not prepared to accept that expectation as reasonable.  Consequently, the conduct of the FAA and the SSA does not implicate the Fourth Amendment.

Cooper's motion to suppress is DENIED.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge

15